IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KAITLIN D. GROSE, )<br>)<br>    *Plaintiff-Appellant*, )<br>)<br>    v. )<br>)<br>KILOLO KIJAKAZI, Acting Commissioner )<br>of Social Security, )<br>)<br>    *Defendant-Appellee*. )<br>) | No. 21 C 5866<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OPINION & ORDER**

Plaintiff-Appellant Caleb Grose[1] was denied supplemental security income (SSI) benefits. (Dkt. 1; Dkt. 11). He seeks judicial review of the administrative law judge's (ALJ) conclusion that, in the absence of substance abuse, he would not be disabled. (Dkt. 11). He also challenges the ALJ's assessment of his residual functional capacity. (*Id.*) The Court affirms in part and vacates in part the ALJ's findings and remands the case to the Social Security Administration for further proceedings. [15]

**BACKGROUND**

Caleb Grose suffers from depression, anxiety, bipolar disorder, posttraumatic stress disorder (PTSD), and substance abuse. (Dkt. 10-1 at 19). He is transgender, and he has been attacked in the past because of his gender identity; and his fear of being attacked again makes him afraid to leave the house. (*Id.* at 48, 51; Dkt. 10-2 at 712, 722–24). He applied for SSI benefits in

---

[1] The Claimant-Appellant's legal name is Kaitlin, but the record shows he goes by Caleb and uses he/him pronouns. (Dkt. 10-1 at 19 n.1; Dkt. 10-2 at 713).

1

January 2020, alleging a disability onset date of May 13, 1994. (Dkt. 10-1 at 40). His application was denied initially and on reconsideration. (*Id.*) He received a hearing before an ALJ in February 2021. (*Id.* at 37). The ALJ denied benefits and the Appeals Council denied review. (Dkt. 11 at 1).

**Treatment History**

In March 2016, Grose went to his local hospital in West Virginia for a foot injury but asked to speak with a crisis worker. (Dkt. 10-1 at 372–409). He was very depressed, having marital problems, and had attempted to commit suicide a few days earlier by taking Benadryl. (*Id.* at 372). He had also recently relapsed on opioids and admitted to a history of drug and alcohol addiction. (*Id*). In November 2016, he overdosed on heroin and was taken to the emergency room. (*Id.* at 294–95). He also tested positive for cocaine and barbiturates at the hospital. (*Id.* at 299).

Grose moved to Illinois at some point thereafter and met with Melissa Siebert, APN, at Salem Township Hospital Rural Health Clinic on May 29, 2019, to establish care. (Dkt. 10-1 at 472). He admitted to a history of alcoholism and drug abuse. (*Id.*) Siebert's notes at that time indicated "no depression, anxiety, hallucinations, sleep disturbances, or suicidal thoughts." (*Id.* at 474). Soon after, he saw Dr. Akhila Ramayapally to establish care for testosterone treatments, and he likewise admitted to a former history of drug abuse, although Dr. Ramayapally's notes indicate that Grose "never" used drugs. (*Id.* at 513–14).

On March 26, 2020—after filing his benefits application in January 2020—Grose had a telehealth psychiatric appointment through Angela Center Behavioral Health Group with Dr. Robert Norman, who evaluated him for PTSD. (Dkt. 10-1 at 565–85). Dr. Norman described Grose's long-term struggles with anxiety and depression, as well as the traumatic events he has endured, including being "jumped" and beaten up for being transgender. (*Id.* at 567). Dr. Norman noted that Grose had intrusive thoughts of trauma and occasional nightmares, was hypervigilant,

and had numerous anxiety symptoms. (*Id.*) He also acknowledged Grose's drug and alcohol history but stated he "[i]s currently clean and sober from all substances." (*Id.*; *id.* at 569). According to Dr. Norman, Grose had a "mildly dysphoric, appropriate" affect and "fair to good" insight." (*Id.*) He gave Grose prescriptions for Atarax and Lexapro. (*Id.*)

About a month later, Grose followed up with Dr. Norman and reported doing well on Lexapro, with a noticeable reduction in anxiety and improvement in his mood. (Dkt. 10-1 at 593). Grose reported no history of alcohol or drug use. (*Id.*) Dr. Norman adjusted his medication and evaluated Grose's mood as "better" and his affect as "euthymic." (*Id.* at 593–94). The following day, Grose followed up with Dr. Ramayapally and admitted to using marijuana. (*Id.* at 615).

On July 2, 2020, Grose went to St. Mary's Hospital and was voluntarily admitted from the emergency department with increased anxiety and suicidal ideations. (Dkt. 10-2 at 738–39). He feared a loss of control and was unable to care for himself after his long-term partner, Karina Moats, trashed his house and left him while he was visiting his mother. (*Id.* at 741, 748–49). This left him feeling "pretty low and devastated," and "struggling with flashbacks and nightmares from past trauma, experiencing increased anxiety, with worsening intensity and frequency of suicidal ideations." (*Id.* at 749). Though Grose denied using drugs except for marijuana, he tested positive for PCP, which puzzled him. (*Id.*) He said his cannabis might have been laced with other drugs he didn't know about. (*Id.*) He was discharged after two days with diagnoses of PTSD and depression with anxiety. (*Id.* at 745).

About three months later, he sought treatment at Community Resource Center. (*Id.* at 708). He wanted to be able "to get out of [his] house and function." (*Id.*) He described traumatic events of his past and reported that he had been clean from heroin for four-and-a-half years and clean

3

from meth for three years. (*Id.* at 712, 719, 722). He was using cannabis daily and would have a beer "very occasionally." (*Id.* at 719).

At Salem Township Hospital in December 2020, Grose had an appointment with nurse practitioner Alicia Yaeger. (Dkt. 10-2 at 637). She noted his report of worsening anxiety and depression since his break-up, feeling "helpless, hopeless, worthless at times," and his self-isolation and social anxiety. (*Id.* at 638–39). He reported daily panic attacks. (*Id.*) He was using "2-3 bowls" of marijuana each day and admitted "occasional" alcohol use. (*Id.*) Ms. Yaeger discussed "options for sobriety and detox w/strong recommendation of long term program" with him. (*Id.* at 641). In a follow-up appointment on January 6, 2021, Grose reported he was doing better, despite still being anxious and having nightmares. (*Id.* at 633). He continued using marijuana. (*Id.*)

At his next appointment with Ms. Yaeger on February 2, 2021, Grose said he was doing better on his meds though anxiety and depression were "still there." (Dkt. 10-2 at 793). He also reported having a recent panic attack in Walmart while trying to shop. (*Id.*) Ms. Yaeger noted the panic attacks had improved, however, because it only happened once that week. (*Id.* at 795). But Grose also reported still needing alcohol to "smooth things to be in public." (*Id.*) Ms. Yaeger assessed Grose with severe recurrent major depression, bipolar disorder, ADHD, PTSD, and a "history" of substance abuse. (*Id.* at 796–97). At an appointment the following month—after his hearing before the ALJ—Grose tested positive for THC and amphetamine. (*Id.* at 801–02). He also reported feeling more motivated and able to stay in control most of the time. (*Id.* at 789). His nightmares were almost gone. (*Id.*)

4

**Hearing Testimony**

At his hearing before the ALJ, Grose testified that he had "been dealing with some mental health issues" and "was abusing drugs" but that he "got clean three years ago." (Dkt. 10-1 at 48). He also denied having any relapses in the past three years. (*Id.* at 49). He had panic attacks in public and only left the house twice a month. (*Id.* at 50). He feared being attacked again because of his transgender identity. (*Id.* at 55). His last job was at a liquor store, but his anxiety made it difficult to handle the public. (*Id.* at 45). That job ended after only a week because he was quarantined after a COVID-19 exposure. (*Id.*) He had also volunteered with his church food pantry for about 10 hours per week off and on for about a year. (*Id.*) Grose enrolled in vocational college to get a computer application online certificate, but he failed his first semester of classes. (*Id.* at 43–44).

**ALJ Decision**

The ALJ applied the five-step analysis required by 20 C.F.R. § 404.1520(a). (Dkt. 10-2 at 16–29). *See Zellweger v. Saul*, 984 F.3d 1251, 1253 (7th Cir. 2021). He concluded that Grose had not engaged in substantial gainful employment since January 2, 2020 (step one). (Dkt. 10-1 at 18–19). He found that Grose suffers from the severe impairments of depression, anxiety, bipolar disorder, PTSD, and substance abuse (step two). (*Id.* at 19).

In step three, he determined that taken together, Grose's impairments were so severe as to be presumptively disabling.[2] (*Id.* at 20). They met the criteria of Listing 12.06—anxiety and obsessive-compulsive disorders—of 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ found the "paragraph A" criteria of that listing met because Grose had a panic disorder or agoraphobia characterized by "a persistent concern or worry about additional panic attacks or their

---

[2] "If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled." 20 C.F.R. § 404.1520(a)(4)(iii).

5

consequences" and a disproportionate fear or anxiety about being outside his apartment or in a crowd. (*Id.*). The "paragraph B" criteria of that listing were satisfied because he found that the combined impairments caused: (1) a "moderate" limitation in understanding, remembering, or applying information; (2) a "marked" limitation in interacting with others; (3) a "moderate" limitation in concentrating, persisting, or maintaining pace; and (4) a "marked" limitation in adapting or managing himself.[3] (*Id.*) Grose's impairments together constituted a disability at step three.

But because this analysis included Grose's substance abuse, the ALJ next had to determine whether substance abuse was *material* to Grose's disability.[4] *See Barrett v. Berryhill*, 904 F.3d 1029, 1032 (7th Cir. 2018) (citing Soc. Sec. Ruling, SSR 13-2p; Titles II & XVI: Evaluating Cases Involving Drug Addiction & Alcoholism (DAA), 78 Fed. Reg. 11939, 11941–42 (Feb. 20, 2013)). In other words, if Grose stopped using drugs and alcohol, would he still be disabled. 20 C.F.R. § 416.935; SSR 13-2p. If so, then the inquiry ends at step three, and he would be entitled to benefits. If not, then the sequential analysis continues to steps four and five. *See* SSR 13-2p.

The ALJ found that, if he stopped using drugs and alcohol, Grose would not be disabled. (Dkt. 10-1 at 21–23). He found the opinion of Dr. Richard J. Hamersma—the state agency reviewing physician who evaluated Grose's application at the reconsideration stage—persuasive.

---

[3] "Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2). "Paragraph B of each listing (except 12.05) provides the functional criteria we assess . . . to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. . . . To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning." § 12.00(A)(2)(b). A moderate limitation means that a claimant's ability to sustain functioning in that area is "fair," whereas a marked limitation means that a claimant's ability to sustain functioning in that area is "seriously limited." § 12.00(F)(2); *see also Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) ("'[F]air' in ordinary usage does not mean 'bad' or 'inadequate.'").
[4] Sections 223(d)(2)(C) and 1614(a)(3)(J) of the Social Security Act provide that a claimant "shall not be considered to be disabled . . . if alcoholism or drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled."

(*Id.* at 22). Dr. Hamersma found that, even including substance use, Grose had only "moderate" limitations in all four paragraph B criteria for Listings 12.04, 12.06, 12.11, and 12.15. (*Id.*; Dkt. 10-1 at 85–86). Though the ALJ had revised Dr. Hamersma's assessment of two of the four paragraph B criteria for Listing 12.06 upward to "marked" when considering substance use alongside all other impairments, he otherwise agreed that the medical record and other evidence showed Grose would have only "moderate" limitations in these areas without substance abuse.

The ALJ next conducted the mental residual functional capacity (RFC) assessment.[5] He concluded that without substance use, Grose could: "perform a full range of work at all exertional levels" with some limitations. (Dkt. 10-1 at 23). Specifically, Grose could "learn and engage in rote tasks that are simple, routine, and repetitive, and can be learned by demonstration within 30 days." (*Id.*) Further, he must

> work in a stable setting where there is no more than occasional change in terms of tools used, the processes employed, or the setting itself, and change, where necessary, is introduced gradually. He should avoid work-related interactions with the general public. He cannot perform jobs that involve working in close coordination with co-workers. Therefore, he can work jobs that entail only occasional work-related interaction with co-workers. [He] can occasionally interact with his supervisor to complete work tasks throughout the workday.

(*Id.*)

At step four, the ALJ determined that Grose was unable to perform past relevant work. (*Id.* at 28). Finally, at step five, he concluded based on the testimony of vocational expert Michael Lampley that a significant number of jobs exist nationally that Grose could perform within the scope of his RFC. (*Id.* at 28–29). He therefore denied the benefits application.

---

[5] "If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545." 20 C.F.R. § 1520(e). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling, SSR 96-8p; Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474, 34475 (July 2, 1996).

7

## LEGAL STANDARD

On judicial review, an ALJ's factual findings "shall be conclusive" if supported by "substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). This means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154. This is not a high threshold. *Id.* There must be "an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022). The Court does not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Id.* (quoting *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)).

## DISCUSSION

### A. ALJ's Finding Substance Use Material to Disability

Grose argues that the ALJ did not adequately support his conclusion that, absent substance abuse, Grose would not be disabled. He contends that the ALJ offered no explanation regarding the nature of Grose's various mental impairments to support his materiality determination. But comparing the ALJ's two separate assessments of the paragraph B criteria—first considering the severity of all Grose's impairments and second considering impairments excluding substance abuse—the Court finds that the ALJ considered the record as a whole and adequately supported his conclusion with substantial evidence.

Without substance abuse, the ALJ found the limitations on Grose's ability to interact with others went from "marked" to "moderate." (Dkt. 10-1 at 22). The ALJ corroborated with other record evidence the conclusions of Dr. Hamersma, who reviewed the full medical record on reconsideration and found Grose had a fair ability to interact with others. (*Id.* at 85–87). The ALJ

acknowledged that regardless of substance abuse, Grose has anxiety talking to strangers and fears harassment because of his gender identity. As a result, he seldom leaves the house. He rarely socializes with others after Ms. Moats left him. But the ALJ also noted that he attends church and occasionally volunteers at the church food pantry. (*Id.*)

By contrast, the ALJ found that admitted recent substance use—specifically, marijuana—correlated with self-isolation. Grose's treatment provider in December 2020 recommended a long-term detoxification program in response to his self-reported anxiety issues when he was also using marijuana daily. (Dkt. 10-1 at 20). The ALJ also noted Grose admitted at an appointment shortly before the hearing that he needed alcohol to "smooth things" out while in public. (*Id.*) And on March 2, 2023, Grose had reported a recent increase in anxiety and panic attacks, including at Wal-Mart—a report which the ALJ found "notably" coincided with testing positive for both marijuana and amphetamine that same day. (*Id.*) Finally, the ALJ cited Grose's early history of legal trouble while using substances. (Dkt. 10-1 at 20–21).

Next, the ALJ found that without substance use, the limitations on Grose's ability to adapt or manage himself went from "marked" to "moderate." The ALJ recognized Grose's challenges with handling stress and that he does much better with routines. (Dkt. 10-1 at 22–23). Unexpected changes would still trigger panic attacks, regardless of substance use. But he generally manages his personal care. Though he showers about every two or three days, he prepares food, cleans, does laundry, vacuums, does dishes, cares for pets, and shops at Wal-Mart and online. (*Id.* at 23). The ALJ also noted that his ex-partner used to pay the bills, as Grose would lose focus and become anxious with counting change. (*Id.*) This, according to the ALJ, indicates a "fair" ability to adapt and manage himself. He found this consistent with Dr. Hamersma's assessment and with the medical record. (*Id.* at 22–23). But with substance abuse, the ALJ highlighted that Grose sought

9

hospitalization on July 2, 2020, because he "experienced a loss of control and reported that he was unable to care for himself." (*Id.* at 21). He wanted a controlled environment to adjust his medications. That day, he also tested positive for PCP. (*Id.*) The ALJ found this showed Grose's ability to care for himself was "seriously limited" when accounting for substance use.

Grose and the ALJ agree that it is hard to determine from the record the periods when Grose was clean and sober to compare with periods of substance use. His testimony was inconsistent, and at times, he misrepresented his relapses. But the ALJ provided sufficient evidence showing a correlation between more extreme manifestations of Grose's social anxiety, isolation from others, and self-management challenges with known instances of his substance use. A reasonable mind could find adequate evidence of such a correlation. True, correlation does not always equate to but-for causation. Here, though, the ALJ provided sufficient evidence to suggest a causal link between substance use and severe limitations in his functioning. He built a logical bridge between the evidence and his conclusion to show that substance use was material to Grose's disability determination. Thus, the sequential inquiry could not end at step three. The ALJ proceeded to the RFC assessment of Grose's functional deficits.

**B.     ALJ's RFC Assessment of Functional Deficits**

The ALJ must determine "what an individual can still do despite his or her limitations based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (cleaned up and internal citations omitted). The ALJ must consider all relevant evidence in the record. SSR 96-8p. He may not discount evidence contrary to the ruling. *Murphy*, 759 F.3d at 817 (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)). But his determination "need not contain a complete written

10

evaluation of every piece of evidence." *Id.* (citing *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)).

The ALJ largely adopted the opinions and findings of the reviewing state agency psychologists, Dr. DiFonso and Dr. Hamersma. (*Id.* at 27). He was "generally persuaded" by their RFC determinations, particularly that of Dr. Hamersma. (*Id.*) For his part, Dr. Hamersma found that Grose had the "symptoms" of ADHD, depression, anxiety, agoraphobia, memory issues, learning issues, and panic disorder. (Dkt. 10-1 at 88). While he agreed that Grose's medically determinable impairments could produce such symptoms, Dr. Hamersma concluded—and the ALJ concurred—that Grose's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence. (*Id.*; *id.* at 28). With the benefit of Grose's hearing testimony, however, the ALJ decided that Grose's ability to socialize was more limited than Dr. Hamersma indicated. (*Id.* at 27). He therefore concluded that Grose could work jobs that entail only occasional interaction with co-workers. (*Id.* at 27). "[S]uch limitations will also very substantially reduce work stress and enable him to better persist at work endeavors." (*Id.*)

What both opinions neglect, however, is an explanation of *why* the medical record and other record evidence failed to support the intensity of Grose's symptoms as alleged. Moreover, the ALJ fails (as did Dr. Hamersma) to explain how he reached his conclusion that Grose—who suffers regular panic attacks, rarely leaves the house due to fear of being attacked, has difficulty concentrating and remembering simple instructions, and shuts down when overly stressed—can sustain unskilled work activities for 8 hours a day, 5 days a week. *See Mandrell v. Kijakazi*, 25 F.4th 514, 518–19 (7th Cir. 2022) (finding RFC assessment inadequately supported what claimant could and could not do "in light of her severe PTSD and other psychological conditions" where

11

ALJ did not "explain how a person with her problems in concentration, persistence, and pace could perform at the level described in his RFC").

Grose argues that the ALJ failed to consider the combined effects of Grose's identified severe mental impairments—absent substance abuse—in the RFC assessment. Grose observes, and the Court agrees, that the ALJ merely summarized the hearing testimony and gave a longitudinal (albeit detailed) recitation of Grose's medical treatment history. But he then failed to "connect the dots" to explain why Grose can still perform full-time, unskilled work on a regular and ongoing basis, despite the limitations imposed by his multiple severe psychiatric conditions (absent substance abuse). *See Mandrell*, 25 F.4th at 518.

For example, throughout Grose's medical history, various providers diagnosed him with PTSD from being jumped and beaten up because of his transgender identity. Several linked this to his agoraphobia and anxiety being in public. Grose testified that he constantly fears being harassed and attacked again because he is transgender. He only leaves the house twice a month, accompanied by a friend, to do necessary shopping. When he does leave, it takes him two hours to work himself up to it. The ALJ failed to address how Grose, given his PTSD and anxiety, can manage getting to a workplace five times per week and sustain work activities with "occasional" interactions with co-workers 8 hours a day. It is unclear what evidence the ALJ relied on to reach this conclusion.

It appears that the ALJ doubted Grose's credibility because he testified inconsistently about his substance use. (*Id.* at 28). Specifically, Grose testified that he had been clean and sober for two years, when other evidence showed (1) he had tested positive for cannabis and PCP on July 2, 2020; (2) he had admitted in October 2020 using cannabis daily and drinking beer occasionally; and (3) he later (after the hearing) tested positive for THC and amphetamine. (*Id.* at 28). But these

12

inconsistencies shed little light on Grose's credibility as to his baseline limitations in concentrating, interacting with others, following instructions, and managing himself, in the absence of substance use. Indeed, it seems that the ALJ credited Grose's statements about his anxiety interacting with others by finding his abilities in that domain more limited than Dr. Hamersma had found. (Dkt. 10-1 at 27). It is unclear from the opinion why some of Grose's statements about his symptoms were credible and supported by the medical evidence, while others where not.

      The ALJ failed to explain where the objective medical record did not support the severity of Grose's symptoms as alleged. He fell back, instead, on boilerplate language that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at 28). But there are no reasons given. The ALJ must adequately connect his detailed review of the facts in the record with the conclusions reached in the RFC assessment. *See Mandrell*, 25 F.4th at 518–19.

**Conclusion**

The Court grants in part and denies in part the Commissioner's Motion for Summary Judgment. [15] The Court affirms the ALJ's findings at step three of the sequential analysis, as the ALJ adequately supported with substantial evidence his conclusion that Grose's substance use was material to the disability determination. The Court vacates the ALJ's RFC assessment and remands to the Social Security Administration for further proceedings consistent with this opinion.

_____
Virginia M. Kendall
United States District Judge

Date: March 20, 2023